**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 21-CV-885

TODD ROMERO,

      Plaintiff,

v.

ALTITUDE SPORTS & ENTERTAINMENT, LLC, and
KROENKE SPORTS & ENTERTAINMENT, LLC

      Defendants.

---

## COMPLAINT AND JURY DEMAND

---

      Todd Romero ("Romero" or "Plaintiff"), by and through his undersigned attorney, hereby submits his Complaint and Jury Demand ("Complaint") against Altitude Sports & Entertainment, LLC ("Altitude") and Kroenke Sports & Entertainment, LLC ("Kroenke") (jointly referred to as "Defendants" or "Altitude/Kroenke"), as follows:

### INTRODUCTION

      Altitude/Kroenke intentionally discriminated against Todd Romero, Defendants' only Hispanic on-air host, removing him from a successful sports host and reporter who hosted between fifty (50) to sixty (60) National Basketball Association's Denver Nuggets ("Nuggets") and National Hockey League's Colorado Avalanche ("Avalanche") games per year, to a literal afterthought who provides short features on gambling, taped from his home computer, during the same games that he used to host.  For years, Altitude/Kroenke paid Romero less than his non-Hispanic, non-brown-skin colored peers despite his consistently stellar performance.  After Romero used his vacation time to successfully receive in-patient treatment primarily for

prescription medication addiction related to a severe neck injury, Altitude/Kroenke regarded Romero as disabled and intentionally and unlawfully discriminated against him by not renewing his contract, falsely claiming that all on-air talent was being moved to at-will employment (when they were not) and systematically taking away all of Romero's on-air host duties in favor of other hosts who are non-regarded as disabled, non-Hispanic, non-brown-skin colored, and younger than 40-years old.  Altitude/Kroenke retaliated against Romero for engaging in protected activity after he filed Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alienating him from his coworkers, stripping him of all host duties, and severely diminishing his reputation.  For the 2020-2021 season, Romero is Altitude/Kroenke's only on-air host who is not hosting any Nuggets or Avalanche games, is not permitted back in the studio, and is required to produce all of his short features from his home on his computer.

Altitude/Kroenke's systematic and intentional discriminatory and retaliatory actions, aimed at harming Romero, left him no choice but to bring claims of disability, race, and age discrimination, and retaliation to recover damages for both monetary loss and the extreme emotional distress Altitude/Kroenke caused.  Romero also brings a claim for breach of contract for Altitude/Kroenke's breach of its promise to pay Romero a guaranteed $5,000.00 bonus.

## JURISDICTION AND VENUE

1.     This action arises under the Americans with Disabilities Act of 1990, Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967, and 42 U.S.C. § 1981.  The Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331.

2.     Venue is proper in the United States District Court for the District of Colorado pursuant to 28 U.S.C. § 1391 because the events giving rise to the instant claims occurred within this District and Defendants reside in this District.

3.     The Court has supplemental pendent jurisdiction pursuant to 28 U.S.C. § 1367 because the violations of federal law alleged are substantial and pendent causes of action derive from a common nucleus of operative facts.

## FACTUAL BACKGROUND

A.     **General Background**

4.     Altitude/Kroenke is a sports cable and satellite television channel that broadcasts the games of the Nuggets and the Avalanche, and various local collegiate and high school sports.

5.     Since 2012, Romero has been jointly employed by Altitude/Kroenke as an on-air sports host and reporter.

6.     Kroenke owns Altitude and shares direct control over Romero's workplace and employment with Altitude, including his pay, work schedule, and conditions of employment.

7.     Kroenke and Altitude have significant interrelations, have common management, have a centralized control of labor relations, and have common ownership and financial control.

8.     Romero is 56-years old, Hispanic, and has brown-skin color.

9.     Romero is the only Hispanic on-air talent and one of only two persons of color out of seventeen on-air personalities currently employed by Altitude/Kroenke.

10.     Romero has been in the sports broadcasting business for over thirty years.

11.     During Romero's tenure with Altitude/Kroenke, Romero has hosted pre- and post-game shows for the Nuggets and Avalanche, provided play-by-play analysis for high school football and for the University of Denver men's and women's basketball teams.

12.     Romero has maintained excellent performance, recently reflected by an Emmy award with the 2018 Nuggets broadcast team, and two Emmy nominations he received during 2019.

13.     Romero has never received a negative performance evaluation during his employment with Altitude/Kroenke.

14.     During Romero's employment with Altitude/Kroenke, most, if not all, on-air talent, including Romero, received employment contracts.

15.     In January 2016, Romero entered into a renewed contract with Altitude/Kroenke for an initial term of two years, with an option for Altitude/Kroenke to extend the contract for an additional one-year period through January 29, 2019.

16.     During the first and second years of the contract, Romero was paid $95,481.00 (2016-2017), and $98,345.00 (2017-2018), respectively.

17.     If Altitude/Kroenke exercised the third-year option of the contract, Romero was to be paid $101,295.55 for the 2018-2019 contract period.

**B.      Romero Seeks Treatment**

18.     In June and July of 2016, Romero took thirty days leave, using his accrued vacation time, to attend a rehabilitation facility ("rehab") primarily for an addiction to medication prescribed after sustaining a serious neck injury.

19.     Romero successfully completed the rehabilitation.

20.     Altitude/Kroenke was aware of the reason for his leave.

21.     When Romero entered rehab, his wife called Altitude/Kroenke Senior Producer/Director Doug Menzies ("Menzies") and Ben Boylan ("Boylan"), President of Altitude Sports & Entertainment, to tell them that Romero needed to take about a month off to seek treatment. Boylan approved the time off.

22.     While in the rehab facility, Romero spoke with Boylan twice and Boylan understood from where Romero was calling.

23.     During one of the calls, Romero expressed concern about Matt Hutchings ("Hutchings"), Altitude's President and Kroenke's Executive Vice President and Chief Operating Officer, finding out about his treatment because Hutchings hired Romero and had the ability to terminate or otherwise affect the terms and conditions of his employment.

24.     Menzies and/or Boylan told Matt Krol ("Krol"), Altitude/Kroenke Senior Coordinating Producer, Scott Bay ("Bay"), Altitude/Kroenke Senior Producer and Director, and Ken Miller ("Miller"), Executive Vice President & General Manager/Executive Producer, managers at Altitude/Kroenke directly in charge of Romero's work, that Romero's absence was due to his attending a rehab facility.

25.     Shortly after Romero returned from rehab, he met with Menzies and discussed with him that he had been in rehab to address addiction to medication as a result of his neck injury. Menzies replied "Kenny [Miller] was wondering what it was that had you in treatment.  I told him it does not matter as long as he [Romero] received help."

26.     Because Romero was concerned that Miller, his supervisor, was speculating as to why he attended rehab, he soon after, personally told Miller and Krol the nature of his issue and why he had attended rehab.

27.     After Romero told Krol, Krol confided that he had a family member who had been arrested for being under the influence of the same medication.

28.     Romero's work performance was not negatively impacted before or after he addressed his addiction at a rehab facility.

29.     In fact, in approximately August or September of 2017, Miller had a meeting with Romero and told him that he was being significantly underpaid and that Miller would go to Hutchings to advocate for raising Romero's salary to $140,000.00 and renewing his contract for

another term.

30.     However, in or around October of 2017, Miller told Romero that although he had gone to Hutchings, Altitude/Kroenke would not extend Romero's contract or give him a raise in part because Romero went to rehab to address his addiction to sleeping medication in the summer of 2016.

31.     Shocked by Miller's statement, Romero immediately stopped the conversation and informed Miller that it was illegal for Altitude/Kroenke to use Romero's period of rehabilitation, for which Romero took his personal vacation days, against Romero in making employment decisions.

32.     Romero excused himself from the meeting to take a break and collect his thoughts and called his wife to tell her what happened.

33.     When Romero returned from speaking to his wife, Romero reiterated to Miller that Altitude/Kroenke could not base its decision to enter into a new contract or give Romero a raise on Romero having attending rehab.

34.     Miller then changed his reasoning and said that Hutchings said Romero would not be eligible for a new contract until he first fulfilled the third-year option of his then-current contract.

35.     However, Miller assured Romero that Altitude/Kroenke would be picking up his third-year contract option beginning on January 30, 2018 which provided a raise to $101,295.55.

36.     In approximately November of 2017, Romero experienced a short, three-second pause during a live broadcast, which occurred due to confusion from the producers in Romero's earpiece over who he was supposed to introduce for the next segment.  Such pauses, although generally uncommon for Romero due to his high-performance level, are relatively routine in the

live broadcasting world.

37.     Shortly after completing the segment, Romero received a text message from Krol, who knew about Romero's stint in rehab, pointedly asking Romero if he was "ok" and if anything was "wrong."  Romero had never been questioned about a pause during broadcasting before, and the insinuation was clear that there were concerns stemming from him having sought treatment for addiction.  Romero was so concerned by the response that Romero felt the need to speak to Miller and defend himself.

38.     In contrast, prior to a 2018 University of Denver Women's basketball game broadcast on-air on Altitude Television wherein Romero was providing play-by-play and Katy Winge ("Winge"), then approximately 25-years old and in her first few years of employment with Altitude/Kroenke, was providing color commentary, Romero had interviewed the nation's leading three-point shooter, and asked where she aimed her shot.  The player informed Romero that she aimed for the center of the hoop.  When Romero relayed this conversation on air, Winge condescendingly told Romero, "That's not a thing. I don't believe it." Romero was shocked by the response because this was out of line and unprofessional, and conduct meriting discipline. When Romero complained about the incident to Miller, Romero was ignored and nothing was done.

39.     On January 30, 2018, Romero believed his third-year option had begun and that he remained under contract based on Miller's previous representations.

40.     Romero's salary was increased to $101,295.55 as of January 30, 2018, but without picking up the third-year option of his contract, unbeknownst to Romero.

41.     On February 13, 2018, Miller informed Romero for the first time that Altitude/Kroenke did not pick up the third year of the contract because Altitude/Kroenke was "moving everyone to at-will employment instead of contracts."

42.     Romero was shocked and concerned because this was now a *third* reason that Altitude/Kroenke had given him for why his contract was not renewed, but Romero took Miller at his word that all Altitude/Kroenke on-air talent were going to be transitioned to at-will employment.

43.     In trying to convince Romero that being an at-will employee was more beneficial than having a contract, Miller told Romero that "being at-will meant that you could only be fired for cause."

44.     Later, after researching the issue, Romero challenged Miller on that statement because it was not the law, as he understood it, and in response Miller said, "why should you be treated any better than I am?" Romero left the issue alone because he took Miller at his word that all Altitude/Kroenke on-air talent were going to at-will.

45.     In February 2019, Miller approached Romero and told him that, although Altitude/Kroenke would still not approve increasing Romero's annual salary up to $140,000.00 where Miller thought Romero should be, Miller was able to raise Romero's salary to $118,900.00 and promised him that he would receive a guaranteed $5,000.00 bonus to be paid December 2019.

46.     Romero had previously received a $5,000.00 bonus every year due to his excellent work performance and effort, so having this bonus guaranteed did not change Romero's compensation as compared to previous years. However, this was the first time that Altitude/Kroenke had guaranteed that Romero would receive the bonus.

47.     Despite the raise, Romero had been and continues to be underpaid in comparison to Romero's non-Hispanic, non-brown-skin colored, and/or non-disabled/regarded as disabled peers.

48.     Also, unlike Romero's Non-Hispanic, non-brown-skin colored, and/or non-

disabled/regarded as disabled peers, Romero continued to work without a contract.

**C.     Additional Discriminatory Treatment of Romero**

49.     On February 26, 2019, Romero escorted a guest on the floor of the Pepsi Center as part of an on-air segment.

50.     Romero wore credentials around his neck during the on-air segment because the guest was receiving special access as a part of the story.

51.     During the taped spot, Romero's co-worker, Winge, then about 26-years-old Caucasian non-disabled/regarded as disabled female Altitude/Kroenke Reporter/Analyst, ripped off Romero's credentials from his neck.

52.     Romero was shaken by the incident, especially given his prior neck injury, and reported it to Krol.  Nothing was done in response to Winge's actions.

53.     On April 16, 2019, Winge and Romero worked together during a Nuggets game.

54.     Romero, who is 5'7," asked Winge, who is much taller than him and was wearing heels, how tall she was with her heels on.

55.     Winge responded quickly to Romero's inquiry about her height, and threatened Romero, yelling "If you ask me that again, I'm going to punch you in the face."  Winge did not say it in a joking manner.

56.     Romero was shocked because Winge frequently commented on the slight stature of Romero and other on-air talent, and even gave a stepstool to another on-air talent as a gift during a live segment, referencing that on-air talent's short stature.

57.     This was now the second time Winge had acted in a threatening manner toward Romero.

58.     Romero was distressed and scared to complain about Winge's actions because

Romero was not under contract and was concerned about how he had been treated after he went to rehab, and now because Altitude/Kroenke did nothing when Winge previously ripped the credentials from Romero's neck.

59.     However, Romero finally reported the aforementioned incidents with Winge to Miller in October 2019, who told Romero that he was already "aware" of the incidents.

60.     When Romero suggested to Miller that Romero might raise his concerns with Tomago Collins ("Collins"), Executive Vice President of Communications and Business Development at KSE, and who is African-American, Miller laughed at the suggestion indicating that any complaints would be futile.  Several other times throughout Romero's employment, Miller made multiple inappropriate comments about Collins, including that Collins was Stan Kroenke's "lapdog," and that Miller did not know why Collins received the Executive Vice President position because Collins was from the "inner city" and had no background in the industry.

61.     Ultimately, Romero's complaints about Winge were ignored.

**D.     Disparate Treatment**

   **i.     After Being Told That All On-Air Talent Were Being Moved to At-Will Employment, Romero Discovered in the Fall of 2019 that Seven (7) of Romero's Peers Received Contracts, Romero Did Not Receive a Renewed Contract, and He Continued to be Significantly Underpaid as Compared to Non-Hispanic, Non-Brown-Skin Colored, and/or Non-Disabled/Regarded as Disabled On-Air Talent**

62.     Romero first discovered in the fall of 2019 that the stated reason for not picking up Romero's third-year option or renewing his contract for another term, that Altitude/Kroenke "was moving everyone to at-will employment instead of contracts," was false.

63.     In the fall of 2019, Romero discovered for the first time that most, if not all, full-time non-Hispanic, non-brown-skin colored, non-disabled/regarded as disabled on-air talent employed by Altitude/Kroenke were under contract.

64.     In fact, seven (7) of his on-air talent peers, who are non-Hispanic, non-brown-skin colored, and/or non-disabled/regarded as disabled, received new contracts or the option year of their contracts picked-up after Miller told Romero Altitude/Kroenke was moving all on-air talent to at-will employment status, including but not limited to: Winge, Lauren Jbara ("Jbara"), Conner McGahey, Kyle Keefe, Chris Marlowe, Scott Hastings, Marc Moser, and Lauren Gardner.

65.     Chris Dempsey, who is African-American and the only other on-air talent of color, had no contract according to Miller, and was, and still is, an at-will employee.

66.     Right after Dempsey was hired, Miller made comments to Romero that Dempsey was only hired because he was "Black," "[the hiring decision] came from above," and "this is the NBA."

67.     In the fall of 2019, Romero also first became aware that he was, in fact, being paid considerably less than non-Hispanic, non-brown-skin colored, and/or non-disabled/regarded as disabled on-air talent with comparable experience and performance, including but not limited to Kyle Keefe and Vic Lombardi.

**ii.     Altitude/Kroenke Strips Romero of His Job Duties and Responsibilities**

68.     When the 2019-2020 Nuggets Talent Schedule was released in October 2019, Romero discovered that his assignments had been drastically cut as compared to his assignments during the 2018-2019 season and previous seasons, whereas the assignments of non-Hispanic, non-brown-skin colored, non-disabled/non-regarded as disabled, and younger on-air talent had been increased.

69.     Working Nuggets games is the most high-profile assignment for on-air talent and not being assigned these games is a clear demotion, impacting Romero's profile, opportunities to improve his brand, and ultimately his pay and value to Altitude/Kroenke and in the industry.

70.     Altitude/Kroenke's decision to cut Romero from working Nuggets games cannot credibly be attributed to performance issues.

71.     Rather, Romero's assignments were substantially cut because of Romero's race, brown-skin color, national origin, age, and disability/being regarded as disabled.

72.     Notably, Altitude/Kroenke redistributed Romero's hosting and other high-profile assignments to younger employees, particularly, Winge and Jbara, both of whom are under 40 years old.

73.     When Romero informed Miller of the drastic reduction in Nuggets games, Miller stated that the schedule needed to be and would be adjusted.  However, the schedule was not adjusted until after Romero formally complained to Altitude/Kroenke about the discriminatory treatment and then was only adjusted to provide Romero a few low-profile Nuggets games.

### iii.     Altitude/Kroenke Retaliated Against Romero for Lodging a Complaint of Discrimination and Filing His EEOC Charge

74.     On November 4, 2019, Romero made a formal complaint to Hutchings about Altitude/Kroenke's discriminatory and retaliatory treatment, including but not limited to his comments about Romero's rehabilitation and the perception of a disability, the decision to move him and no other on-air talent to at-will employment, his continual underpayment, the significant reduction in his job duties, and other discriminatory treatment.

75.     On November 19, 2019, Romero filed his Charge of Discrimination (the "First Charge") with the Equal Employment Opportunity Commission based upon age, race, national origin, and disability discrimination, and retaliation.  A true and accurate copy of Romero's First Charge of Discrimination, Charge No. 541-2020-00546, is attached hereto as **Exh. A**.

76.     After complaining about discrimination, Romero did not receive the $5,000.00 bonus in 2019 that Miller had previously promised would be guaranteed.

77.     In January 2020, after Altitude/Kroenke became aware of Romero's First Charge, Miller convened a staffing meeting. At the meeting, Miller announced that Romero's reduced Nuggets hosting assignments was due to the fact that Romero was initially going to host a Nuggets and Avalanche show and that Romero would now be added to the Nuggets talent hosting schedule moving forward.

78.     Miller's announcement at the meeting was bizarre because: (1) Miller was announcing to all of the staff the purported explanations for Romero's lack of assignments, (2) Miller previously told Romero that the schedule was going to change, but he did not change the schedule, and (3) because the Nuggets and Avalanche show to which he attributed Romero's lack of scheduled Nuggets games had been canceled approximately one month prior to the Nuggets' talent schedule announcement in October 2019 and therefore would have had no effect on Romero's availability when the talent host schedule was created.

79.     Further, Romero was only added to eleven (11) Nuggets' games over a period of four months.  Notably, Romero was not originally assigned to any high profile Nuggets games.

80.     Despite the additional eleven (11) games, Romero's 2019-2020 workload was still drastically lower than his usual workload of approximately fifty (50) to sixty (60) Nuggets games in previous years.

81.     Despite not being assigned to any significant Nuggets games, Romero *was* assigned to "Hispanic Heritage Night" at the Nuggets game on March 3, 2020.

82.     Later in January 2020, Romero was pulled into a meeting with a Kroenke human resources employee and was told that he should not talk about his complaints regarding discrimination and retaliation because allegedly two other people had complained about Romero's claims.

13

83.     Despite enduring the continuing discrimination and retaliation, Romero continued working to the best of his abilities and always received positive feedback.

84.     During the COVID-19 shutdown of the NBA season, in March 2020, Altitude/Kroenke started planning a daily live show called Sports Social, which was hosted on social media websites, applications, and aired on television.

85.     Romero was the only host <u>not</u> involved or assigned <u>any</u> work in the preliminary plan for the Sports Social.

86.     Romero's absence from the Sports Social was readily apparent when Altitude/Kroenke failed to mention Romero in the initial draft of the press release, which was internally circulated on March 30, 2020.

87.     The first show debuted with all of Altitude/Kroenke's on-air talent except Romero.

88.     In an article published about the show on April 14, 2020, it was announced that the show would feature a "rotating cast of Altitude/Kroenke on-air talent" of Lombardi, Keefe, Winge, Moser, and McGahey.  The article did not mention Romero.

89.     As Sports Social continued, almost every other host was on-air multiple times a week.

90.     Conversely, Romero was barely involved in Sports Social, generally limited to a 5- to 10-minute guest segment once a week.  There were also a few weeks where he was not asked to participate at all.

91.     At the end of May 2020, Miller and Bay sent a text to a group titled "All Nuggets Talent" about a meeting on the following Monday of "great importance" regarding return to game broadcast strategy for the Nuggets.

92.     The   text   was   sent   to   all   of   Altitude/Kroenke's   on-air   talent   except   for

Romero.  Romero only became aware of the text after he was told about it and his omission by another Nuggets on-air talent.

93.     Romero had to reach out to Bay to inquire about the meeting, who subsequently sent Romero the information.

94.     In August, 2020, the isolation and Altitude/Kroenke's persistent discriminatory treatment caused Romero severe emotional distress.  As a result, Romero relapsed and obtained treatment in rehab, which he successfully completed.

   **iv.   Altitude/Kroenke Further Retaliated Against Romero Based upon Romero's Second Charge of Discrimination**

95.     On September 25, 2020, Romero filed a second charge of discrimination ("Second Charge") with the EEOC, Charge No. 541-2021-00482, containing allegations of discrimination for race, national origin, age, disability, and retaliation based on the events, described immediately above, that occurred after Romero filed his First Charge.  A true and accurate copy of Romero's Second Charge of Discrimination, Charge No. 541-2021-00482, is attached hereto as **Exh. B**.

96.     For the first time in his career with Altitude/Kroenke, and despite his employment as a host, Romero has not been given any hosting duties during the course of the 2020-2021 NBA season.  Romero has not been informed when, if ever, he would be hosting again.

97.     Instead, Romero has been relegated to appearing in feature stories, which are typically 4- to 5-minute pre-recorded video pieces aired during the pre-game show of the Nuggets game's broadcast.

98.     In addition to removing him from hosting duties, Romero is the only Altitude/Kroenke full-time on-air talent who is not permitted to come into the studio.

99.     Since all of Romero's video appearances are recorded at home using video-conferencing applications such as Zoom, his limited airtime is further marred by the significantly

degraded video and audio quality.

100.   In addition to being relegated to at-home video features, Romero continues to be omitted from Altitude/Kroenke's NBA coverage.

101.   Significantly, Romero was the only on-air host excluded from participating in Altitude/Kroenke's November 18, 2020 NBA Draft Show ("Draft Show").

102.   In fact, Romero was not even included in the email which outlined the schedule for the Draft Show.

103.   On November 19, 2020, despite not being included in the Draft Show, Romero emailed Bay, Miller, and several other Altitude/Kroenke producers offering to create 2- to 4-minute video packages to address an unexpected Nuggets draft trade.

104.   Romero, however, never received a response.

105.   In December 2020, in response to Romero's email inquiring about the upcoming holiday schedule, Bay wrote that the schedule was uncertain but that Romero should "keep[] doing your main role, producing features…."

106.   This was the first time that Altitude/Kroenke articulated Romero's demotion from host to feature production.

107.   Prior to being perceived as disabled, the hiring of younger on-air talent Winge and Jbara, and first complaining about discriminatory treatment, Romero was regularly assigned hosting duties to both Nuggets and Avalanche games, often times hosting fifty (50) to sixty (60) Nuggets and/or Avalanche games per year.

108.   To date, however, Romero continues to be excluded from his regular duties of participating in media coverage related to Nuggets and Avalanche games.

109.   To date, Romero has also been denied multiple opportunities for professional

advancement such as additional TV appearances, providing color commentary on live games, or even production opportunities.

110.    Conversely, Altitude/Kroenke has repeatedly provided these opportunities to other non-Hispanic, non-brown-skin colored, non-disabled/regarded as disabled, and/or under 40-year-old individuals, who have either equal or much less experience than Romero.

111.    In February, 2021, after emailing his direct supervisor Miller to ask whether he – a host – would be hosting any Nuggets games this season and whether he would be able to come into the studio to do his job, Romero was first informed that he would no longer report to Miller. Instead, he would be reporting to Travis Honderd ("Honderd"), who was a studio manager and director.

112.    Romero was the only on-air talent who directly reported to Honderd.

**E**.    **Romero Has Administratively Exhausted Both Charges**

113.    On January 4, 2021, Romero received his Notice of his Right to Sue Letter from the EEOC for his first Charge of Discrimination.   A true and accurate copy of the Right to Sue Letter for Charge No. 541-2020-00546 is attached hereto to as **Exh. C**.

114.    On January 14, 2021, Romero received his Notice of his Right to Sue Letter from the EEOC for his second Charge of Discrimination, Charge No. 541-2021-00482.   A true and accurate copy of the Right to Sue Letter for Charge No. 541-2021-00482 is attached hereto to as **Exh. D**.

## COUNT I - ADA DISABILITY DISCRIMINATION

115.    Romero restates and realleges the allegations in Paragraphs 1 to 114 as if though fully set forth herein.

116.    Romero sustained a neck injury, which resulted in doctors prescribing medication.

117.    Romero developed an addiction to the prescribed sleep medication after taking it for 15 years.

118.    As a result of Romero's addiction to the sleeping medication and other substances, his impairment substantially limited one or more major life activities including but not limited to his ability to sleep.

119.    To overcome his addiction and disability, Romero sought treatment in a rehabilitation facility.

120.    Romero successfully completed his rehabilitation and was no longer disabled.

121.    Despite that Romero successfully completed the rehabilitation, Altitude/Kroenke regarded Romero as having an impairment and discriminated against him because of it.

122.    Altitude/Kroenke's discriminatory treatment resulted in multiple adverse employment actions taken against Romero.

123.    Unlike Romero's similarly situated peers who are non-disabled/regarded as disabled, Altitude/Kroenke:

  a.  paid Romero a substantially lower salary than similarly situated non-disabled/regarded as disabled peers;

  b.  did not pick up Romero's third-year option on his contract or provide a new contract, and instead transitioned him to an at-will employee;

  c.  did not increase Romero's salary to $140,000.00;

  d.  did not pay Romero a $5,000.00 bonus that was promised;

  e.  drastically reduced the number of Nuggets and Avalanche games for the 2019-2020 season that Romero was assigned to host, instead giving those opportunities to similarly situated non-disabled/regarded as disabled peers;

f.   repeatedly excluded Romero from meetings and communications regarding the resumption of the 2019-2020 and 2020-2021 Nuggets seasons;

g.   did not include Romero in the planning and severely limited his participation in the Sports Social, while heavily featuring similarly situated non-disabled/regarded as disabled peers;

h.   removed Romero from all hosting opportunities during the 2020-2021 Nuggets season and relegated Romero to appearing in 2- to 5-minute features, instead giving those opportunities to similarly situated non-disabled/regarded as disabled peers;

i.   demoted Romero by removing his hosting duties and limiting Romero's main duties to "producing features;"

j.   did not permit Romero to return to the studio so that he could record his features with professional video cameras and instead required Romero to appear via Zoom or record his features on his home computer, which had much lower video and audio qualities; and

k.   denied Romero multiple opportunities for professional advancement such as additional TV appearances and production opportunities, instead giving those opportunities to similarly situated non-disabled/regarded as disabled peers.

124.   Similarly situated non-disabled/regarded as disabled employees were not subjected to or otherwise denied the same opportunities as Romero.

125.   As a direct result of the aforesaid unlawful discriminatory employment practices engaged in by Altitude/Kroenke in violation of the ADA, Romero sustained permanent and irreparable harm resulting in a loss of earnings, the value of certain benefits, loss of future earning

power, damage to his reputation, and harm to future employment prospects.

126.    As a further direct result of the aforesaid unlawful discriminatory employment practices engaged in by Altitude/Kroenke in violation of the ADA, Romero suffered severe emotional distress, embarrassment, humiliation, and loss of self-esteem.

## COUNT II -ADA RETALIATION

127.    Romero restates and realleges the allegations in Paragraphs 1 to 126 as if though fully set forth herein.

128.    Romero engaged in protected activity when he made a complaint to Hutchings and filed the First Charge regarding disability discrimination.

129.    Altitude/Kroenke retaliated against Romero for making a complaint to Hutchings and filing his First Charge, which resulted in multiple adverse employment actions taken against Romero.  This included but was not limited to Altitude/Kroenke:

    a.   not paying Romero a $5,000.00 bonus that was promised;

    b.   repeatedly excluding Romero from meetings and communications regarding the resumption of the 2019-2020 and 2020-2021 Nuggets seasons;

    c.   removing Romero from all hosting opportunities during the 2020-2021 Nuggets season and relegated Romero to appearing in 2- to 5-minute features;

    d.   demoting Romero by removing his hosting duties and limiting Romero's main duties to "producing features;"

    e.   not including Romero in the planning and severely limited his participation in the Sports Social;

    f.   not permitting Romero to return to the studio so that he could record his features with professional video cameras and instead requiring Romero to appear via

Zoom, which had much lower video and audio qualities; and

g.   denying Romero multiple opportunities for professional advance such as additional TV appearances and production opportunities.

130.   Altitude/Kroenke also retaliated against Romero for filing his Second Charge.  This included but was not limited to Altitude/Kroenke:

a.   repeatedly excluding Romero from meetings and communications regarding the 2020-2021 Nuggets season;

b.   removing Romero from all hosting opportunities during the 2020-2021 Nuggets season and relegated Romero to appearing in 2- to 5-minute features;

c.   demoting Romero by removing his hosting duties and limiting Romero's main duties to "producing features;"

d.   not permitting Romero to return to the studio so that he could record his features with professional video cameras and instead requiring Romero to appear via Zoom or record his features on his home computer, which had much lower video and audio qualities; and

e.   denying Romero multiple opportunities for professional advancement such as additional TV appearances and production opportunities.

131.   Similarly situated employees who did not file charges of discrimination against Altitude/Kroenke were not subjected to or otherwise denied the same opportunities as Romero.

132.   As a direct result of the aforesaid unlawful discriminatory employment practices engaged in by Altitude/Kroenke in violation of the ADA, Romero sustained permanent and irreparable harm resulting in a loss of earnings, the value of certain benefits, loss of future earning power, damage to his reputation, and harm to future employment prospects.

133.    As a further direct result of the aforesaid unlawful discriminatory employment practices engaged in by Altitude/Kroenke in violation of the ADA, Romero suffered severe emotional distress, embarrassment, humiliation, and loss of self-esteem.

## COUNT III-TITLE VII RACE/NATIONAL ORIGIN DISCRIMINATION

134.    Romero restates and realleges the allegations in Paragraphs 1 to 133 as if though fully set forth herein.

135.    As a result of Romero's race, Hispanic, and perceived national origin, Altitude/Kroenke discriminated against Romero in violation of the Title VII.

136.    Altitude/Kroenke's discriminatory treatment resulted in multiple adverse employment actions taken against Romero.

137.    Unlike Romero's similarly situated peers who are non-Hispanic, Altitude/Kroenke:

    a.   paid Romero a substantially lower salary than similarly situated non-Hispanic peers;

    b.   did not pick up Romero's third-year option on his contract, or provide a new contract, and instead transitioned him to an at-will employee;

    c.   did not increase Romero's salary to $140,000.00;

    d.   did not pay Romero a $5,000.00 bonus that was promised;

    e.   drastically reduced the number of Nuggets and Avalanche games for the 2019-2020 season that Romero was assigned to host, instead giving those opportunities to similarly situated non-Hispanic peers;

    f.   repeatedly excluded Romero from meetings and communications regarding the resumption of the 2019-2020 and 2020-2021 Nuggets seasons;

    g.   removed Romero from all hosting opportunities during the 2020-2021 Nuggets

season and relegated Romero to appearing in 2- to 5-minute features, instead giving those opportunities to similarly situated non-Hispanic peers;

h.   demoted Romero by removing his hosting duties and limiting Romero's main duties to "producing features;"

i.   did not include Romero in the planning and severely limited his participation in the Sports Social, while heavily featuring similarly situated non-Hispanic peers;

j.   did not permit Romero to return to the studio so that he could record his features with professional video cameras and instead required Romero to appear via Zoom or record his features on his home computer, which had much lower video and audio qualities; and

k.   denied Romero multiple opportunities for professional advancement such as additional TV appearances and production opportunities, instead giving those opportunities to similarly situated non-Hispanic peers.

138.   Similarly situated non-Hispanic employees were not subjected to or otherwise denied the same opportunities as Romero.

139.   As a direct result of the aforesaid unlawful discriminatory employment practices engaged in by Altitude/Kroenke in violation of the Title VII, Romero sustained permanent and irreparable harm resulting in a loss of earnings, the value of certain benefits, loss of future earning power, damage to his reputation, and harm to future employment prospects.

140.   As a further direct result of the aforesaid unlawful discriminatory employment practices engaged in by Altitude/Kroenke in violation of the Title VII, Romero suffered severe emotional distress, embarrassment, humiliation, and loss of self-esteem.

## COUNT IV -TITLE VII RETALIATION

141.    Romero restates and realleges the allegations in Paragraphs 1 to 140 as if though fully set forth herein.

142.    Romero engaged in a protected activity when he filed the First Charge complaining about race and national origin discrimination.

143.    Altitude/Kroenke retaliated against Romero for filing his First Charge, which resulted in multiple adverse employment actions taken against Romero.  This included but was not limited to Altitude/Kroenke:

    a.   not paying Romero a $5,000.00 bonus that was promised;

    b.   repeatedly excluding Romero from meetings and communications regarding the resumption of the 2019-2020 and 2020-2021 Nuggets seasons;

    c.   removing Romero from all hosting opportunities during the 2020-2021 Nuggets season and relegated Romero to appearing in 2- to 5-minute features;

    d.   demoting Romero by removing his hosting duties and limiting Romero's main duties to "producing features;"

    e.   not including Romero in the planning and severely limited his participation in the Sports Social;

    f.   not permitting Romero to return to the studio so that he could record his features with professional video cameras and instead requiring Romero to appear via Zoom or record his features on his home computer, which had much lower video and audio qualities; and

    g.   denying Romero multiple opportunities for professional advancement such as additional TV appearances and production opportunities.

144.     Altitude/Kroenke also retaliated against Romero for filing his Second Charge.  This included but was not limited to Altitude/Kroenke:

      a.   repeatedly excluding Romero from meetings and communications regarding the 2020-2021 Nuggets season;

      b.   removing Romero from all hosting opportunities during the 2020-2021 Nuggets season and relegated Romero to appearing in 2- to 5-minute features;

      c.   demoting Romero by removing his hosting duties and limiting Romero's main duties to "producing features;"

      d.   not permitting Romero to return to the studio so that he could record his features with professional video cameras and instead requiring Romero to appear via Zoom or record his features on his home computer, which had much lower video and audio qualities; and

      e.   denying Romero multiple opportunities for professional advancement such as additional TV appearances and production opportunities.

145.     Similarly situated employees who did not file charges of discrimination against Altitude/Kroenke were not subjected to or otherwise denied the same opportunities as Romero.

146.     As a direct result of the aforesaid unlawful discriminatory employment practices engaged in by Altitude/Kroenke in violation of the Title VII, Romero sustained permanent and irreparable harm resulting in a loss of earnings, the value of certain benefits, loss of future earning power, damage to his reputation, and harm to future employment prospects.

147.     As a further direct result of the aforesaid unlawful discriminatory employment practices engaged in by Altitude/Kroenke in violation of the Title VII, Romero suffered severe emotional distress, embarrassment, humiliation, and loss of self-esteem.

## COUNT V- VIOLATION OF 42 U.S.C. § 1981

148.    Romero restates and realleges the allegations in Paragraphs 1 to 147 as if though fully set forth herein.

149.    As a result of Romero's race, Hispanic, brown-skin color, and national origin, Altitude/Kroenke discriminated against Romero in violation of 42 U.S.C. § 1981.

150.    Altitude/Kroenke's discriminatory treatment resulted in multiple adverse employment actions taken against Romero.

151.    Unlike Romero's similarly situated peers who are non-Hispanic and non-brown-skin colored, Altitude/Kroenke:

    a.   paid Romero a substantially lower salary than similarly situated non-Hispanic and non-brown-skin colored peers;

    b.   did not renew Romero's contract, or provide a new contract, and instead transitioned him to an at-will employee;

    c.   did not increase Romero's salary to $140,000.00;

    d.   did not pay Romero a $5,000.00 bonus that was promised;

    e.   drastically reduced the number of Nuggets and Avalanche games for the 2019-2020 season that Romero was assigned to host, instead giving those opportunities to similarly situated non-Hispanic and non-brown-skin colored peers;

    f.   repeatedly excluded Romero from meetings and communications regarding the resumption of the 2019-2020 and 2020-2021 Nuggets seasons;

    g.   removed Romero from all hosting opportunities during the 2020-2021 Nuggets season and relegated Romero to appearing in 2- to 5-minute features, instead

26

giving those opportunities to similarly situated on-Hispanic Hispanic and non-brown-skin colored peers;

h.   demoted Romero by removing his hosting duties and limiting Romero's main duties to "producing features;"

i.   did not include Romero in the planning and severely limited his participation in the Sports Social, while heavily featuring similarly situated non-Hispanic Hispanic and non-brown-skin colored peers;

j.   did not permit Romero to return to the studio so that he could record his features with professional video cameras and instead required Romero to appear via Zoom or record his features on his home computer, which had much lower video and audio qualities; and

k.   denied multiple opportunities for professional advancement such as additional TV appearances and production opportunities, instead giving those opportunities to similarly situated non-Hispanic and non-brown-skin colored peers.

152.   Similarly situated non-Hispanic and non-brown-skin colored peers were not subjected to or otherwise denied the same opportunities as Romero.

153.   As a direct result of the aforesaid unlawful discriminatory employment practices engaged in by Altitude/Kroenke in violation of the 42 U.S.C. § 1981, Romero sustained permanent and irreparable harm resulting in a loss of earnings, the value of certain benefits, loss of future earning power, damage to his reputation, and harm to future employment prospects.

154.   As a further direct result of the aforesaid unlawful discriminatory employment practices engaged in by Altitude/Kroenke in violation of the 42 U.S.C. § 1981, Romero suffered

severe emotional distress, embarrassment, humiliation, and loss of self-esteem.

### COUNT VI- RETALIATION IN VIOLATION OF 42 U.S.C. § 1981

155.    Romero restates and realleges the allegations in Paragraphs 1 to 154 as if though fully set forth herein.

156.    Romero engaged in a protected activity when he complained about race and national origin discrimination when he filed the First Charge.

157.    Altitude/Kroenke retaliated against Romero for filing his First Charge, which resulted in multiple adverse employment actions taken against Romero.  This included but was not limited to Altitude/Kroenke:

    a.   not paying Romero a $5,000.00 bonus that was promised;

    b.   repeatedly excluding Romero from meetings and communications regarding the resumption of the 2019-2020 and 2020-2021 Nuggets seasons;

    c.   removing Romero from all hosting opportunities during the 2020-2021 Nuggets season and relegated Romero to appearing in 2- to 5-minute features;

    d.   demoting Romero by removing his hosting duties and limiting Romero's main duties to "producing features;"

    e.   not including Romero in the planning and severely limited his participation in the Sports Social;

    f.   not permitting Romero to return to the studio so that he could record his features with professional video cameras and instead requiring Romero to appear via Zoom or record his features on his home computer, which had much lower video and audio qualities; and

    g.   denying multiple opportunities for professional advance such as additional TV

appearances and production opportunities.

158.    Altitude/Kroenke also retaliated against Romero for filing his Second Charge.  This included but was not limited to Altitude/Kroenke:

    a.  repeatedly excluding Romero from meetings and communications regarding the 2020-2021 Nuggets season;

    b.  removing Romero from all hosting opportunities during the 2020-2021 Nuggets season and relegating Romero to appearing in 2- to 5-minute features;

    c.  demoting Romero by removing his hosting duties and limiting Romero's main duties to "producing features;"

    d.  not permitting Romero to return to the studio so that he could record his features with professional video cameras and instead requiring Romero to appear via Zoom or record his features on his home computer, which had much lower video and audio qualities; and

    e.  denying multiple opportunities for professional advancement such as additional TV appearances and production opportunities.

159.    Similarly situated employees who did not file charges of discrimination against Altitude/Kroenke were not subjected to or otherwise denied the same opportunities as Romero.

160.    As a direct result of the aforesaid unlawful discriminatory employment practices engaged in by Altitude/Kroenke in violation of Section 1981, Romero sustained permanent and irreparable harm resulting in a loss of earnings, the value of certain benefits, loss of future earning power, damage to his reputation, and harm to future employment prospects.

161.    As a further direct result of the aforesaid unlawful discriminatory employment practices engaged in by Altitude/Kroenke in violation of Section 1981, Romero suffered severe emotional distress, embarrassment, humiliation, and loss of self-esteem.

## COUNT VII - ADEA DISCRIMINATION

162.    Romero restates and realleges the allegations in Paragraphs 1 to 161 as if though fully set forth herein.

163.    At all times relevant, Romero has been over the age of 40.

164.    As a result of Romero's age, Altitude/Kroenke has discriminated against Romero in violation of the ADEA.

165.    Altitude/Kroenke's discriminatory treatment resulted in multiple adverse employment actions taken against Romero.

166.    Specifically, unlike Romero's similarly situated peers who are under the age of 40 years old, Altitude/Kroenke:

   a.   drastically reduced the number of Nuggets and Avalanche games for the 2019-2020 season that Romero was assigned to host, instead giving those opportunities to similarly situated peers under the age of 40 years old;

   b.   demoted Romero by removing his hosting duties and limiting Romero's main duties to "producing features;" and

   c.   denied Romero multiple opportunities for professional advancement such as additional TV appearances and production opportunities, instead giving those opportunities to similarly situated peers under the age of 40 years old.

167.    Similarly situated employees who are under the age of 40 years old were not subjected to or otherwise denied the same opportunities as Romero.

168.    As a direct result of the aforesaid unlawful discriminatory employment practices engaged in by Altitude/Kroenke in violation of the ADEA, Romero sustained permanent and irreparable harm resulting in a loss of earnings, the value of certain benefits, loss of future earning power, damage to his reputation, and harm to future employment prospects.

169.    As a further direct result of the aforesaid unlawful discriminatory employment practices engaged in by Altitude/Kroenke in violation of the ADEA, Romero suffered severe emotional distress, embarrassment, humiliation, and loss of self-esteem.

### COUNT VIII - ADEA RETALIATION

170.    Romero restates and realleges the allegations in Paragraphs 1 to 169 as if though fully set forth herein.

171.    Romero engaged in a protected activity when he filed the Charge complaining about age discrimination.

172.    Altitude/Kroenke retaliated against Romero for filing his First Charge, which resulted in multiple adverse employment actions taken against Romero.  This included but was not limited to Altitude/Kroenke:

    a.   not paying Romero a $5,000.00 bonus that was promised;

    b.   repeatedly excluding Romero from meetings and communications regarding the resumption of the 2019-2020 and 2020-2021 Nuggets seasons;

    c.   removing Romero from all hosting opportunities during the 2020-2021 Nuggets season and relegated Romero to appearing in 2- to 5-minute features;

    d.   demoting Romero by removing his hosting duties and limiting Romero's main duties to "producing features;"

    e.   not including Romero in the planning and severely limited his participation in

the Sports Social;

    f.   not permitting Romero to return to the studio so that he could record his features with professional video cameras and instead requiring Romero to appear via Zoom or record his features on his home computer, which had much lower video and audio qualities; and

    g.   denying Romero multiple opportunities for professional advance such as additional TV appearances and production opportunities.

173.    Altitude/Kroenke retaliated against Romero for filing his Second Charge.  This included but was not limited to Altitude/Kroenke:

    a.   repeatedly excluding Romero from meetings and communications regarding the 2020-2021 Nuggets season;

    b.   removing Romero from all hosting opportunities during the 2020-2021 Nuggets season and relegated Romero to appearing in 2- to 5-minute features;

    c.   demoting Romero by removing his hosting duties and limiting Romero's main duties to "producing features;"

    d.   not permitting Romero to return to the studio so that he could record his features with professional video cameras and instead requiring Romero to appear via Zoom or record his features on his home computer, which had much lower video and audio qualities; and

    e.   denying Romero multiple opportunities for professional advancement such as additional TV appearances and production opportunities.

174.    Similarly situated employees who did not file charges of discrimination against Altitude/Kroenke were not subjected to or otherwise denied the same opportunities as Romero.

175.     As a direct result of the aforesaid unlawful discriminatory employment practices engaged in by Altitude/Kroenke in violation of the ADEA, Romero sustained permanent and irreparable harm resulting in a loss of earnings, the value of certain benefits, loss of future earning power, damage to his reputation, and harm to future employment prospects.

176.     As a further direct result of the aforesaid unlawful discriminatory employment practices engaged in by Altitude/Kroenke in violation of the ADEA, Romero suffered severe emotional distress, embarrassment, humiliation, and loss of self-esteem.

## COUNT IX - BREACH OF CONTRACT

177.     Romero restates and realleges the allegations in Paragraphs 1 to 176 as if though fully set forth herein.

178.     In February 2019, Miller approached Romero and told him that, although he still could not increase Romero's annual salary up to $140,000.00 where he thought Romero should be, he was able to raise Romero's salary to $118,900.00 and promised he would be paid a guaranteed $5,000.00 bonus.

179.     Romero accepted the offer of the guaranteed $5,000.00 bonus, which was based on prior performance.

180.     Despite Romero's entitlement to the $5,000.00 bonus, Altitude/Kroenke failed to pay Romero's bonus, which constitutes a breach of their agreement.

181.     Romero suffered damages in the amount of $5,000.00 for Altitude/Kroenke's breach of their agreement.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Todd Romero is entitled to and hereby respectfully requests judgment against Defendants Altitude Sports & Entertainment, LLC, and Kroenke Sports & Entertainment, LLC as follows:

A.      Awarding compensatory damages, including but not limited to backpay, and also for emotional distress and mental anguish;

B.      Awarding punitive and exemplary damages for Defendants' intentional acts in amount sufficient to deter Defendants from any further wrongdoing in violation of federal law, to be determined at trial;

C.      Awarding $5,000.00 for Defendants' breach of contract;

D.      Awarding costs and reasonable attorneys' fees; and

E.      Such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Dated: March 26, 2021                     Respectfully Submitted,

*/s/ Stacey A. Campbell*
Stacey A. Campbell (Atty. Reg. No. 38378)
Aaron W. Chaet (Atty. Reg. No. 55597)
CAMPBELL LITIGATION, P.C.
1410 N. High Street
Denver, CO 80218
Telephone: (303) 536-1833
stacey@campbell-litigation.com
aaron@campbell-litigation.com

**ATTORNEYS FOR PLAINTIFF
TODD ROMERO**