**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Christine M. Arguello**

Civil Action No. 21-cv-00885-CMA-SKC

TODD ROMERO,

      Plaintiff,

v.

ALTITUDE SPORTS & ENTERTAINMENT, LLC, and
KROENKE SPORTS & ENTERTAINMENT, LLC,

      Defendants.

---

**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

This employment discrimination and retaliation matter is before the Court on Defendants' fully briefed Motion for Summary Judgment. (Docs. ## 91, 99, 109); *see generally* (Doc. # 66) (Amended Complaint). For the following reasons, the Motion is GRANTED IN PART AND DENIED IN PART.

## I.    BACKGROUND

### A.  UNDISPUTED FACTS

Plaintiff Todd Romero ("Mr. Romero") is a fifty-nine-year-old Hispanic professional sportscaster. (Doc. # 100-7 at 1.) He claims disability protections after completing addiction rehabilitation programs in 2016 and 2020. *E.g.*, (Doc. # 66-2 at 3.) Mr. Romero's former employer, Defendant Altitude Sports and Entertainment, LLC

("Altitude"),[1] is an independently owned regional sports broadcasting network. *E.g.*, (Doc. # 91-3 at 4, 14.)

1. Mr. Romero Loses his Employment Contract

Mr. Romero joined Altitude in 2012 as a "Studio Host/Reporter/On-Air-Voice Over Talent for Athlete"—a "sportscaster" for short. (Doc. # 100-6.) Mr. Romero's employment responsibilities ranged from hosting the Altitude TV live television channel, sideline reporting, producing "features," play-by-play announcing, and color commentary. (Doc. # 101-7 at 1.) The contract also required anything related to those duties and anything customary to the sportscasting industry. *Id.* In January 2016, Mr. Romero signed a superseding contract. (Doc. # 101-7.) This 2016 contract expired on January 30, 2018, but provided an optional one-year extension at Altitude's discretion. (Doc. # 101-7.)[2]

Mr. Romero's second employment term occurred as Altitude executives began looking to "upgrad[e]" the network. (Doc. # 92-2 at 6.) To do so, they first recruited thirty-three-time-Emmy-award-winning sportscaster Vic Lombardi to become the new "face of the network," *i.e.*, the lead sports anchor. (Doc. # 91-3 at 7–8.) Altitude next hired a new executive producer, Ken Miller, to supervise the network's sportscasters and live game production. (Doc. # 92-2 at 3–4.)

---

[1] The other defendant in this case, Defendant Kroenke Sports and Entertainment, LLC, is Altitude's parent corporation. There is no need to distinguish the two entities for the purposes of this order.

[2] As explained below, because the Court ultimately concludes that Mr. Romero failed to exhaust his administrative remedies as to the 2016 contract's non-renewal, the salient facts regarding his contract are when he learned of the contract's non-renewal and when he filed the EEOC charge referencing non-renewal. The Court omits all other details as extraneous.

In September 2017, Mr. Miller advised Mr. Romero that Altitude planned to let the 2016 contract expire. (Doc. # 99-15 at 3.) On January 30, 2018, as promised, Altitude declined to exercise the option, so Mr. Romero's 2016 contract expired. (Doc. # 102-1 at 3.) Consequently, Mr. Romero became Altitude's first of several at-will employees. *Id.* Mr. Romero states that he learned this on February 13, 2018. *Id.*

2. Altitude Loses Revenue over Failed Carriage Contract Negotiations

In fall 2018, Altitude executives began worrying about the network's struggling negotiations over carriage contracts[3] with Comcast, DISH Network, and DirecTV. (Doc. # 91-3 at 11.) The network reacted by taking steps to minimize the network's "financial liabilities." (Doc. # 92-2 at 12; Doc. # 91-15 at 2.) Those measures included leaving thirteen empty positions vacant, letting contracts expire to reduce the network's "long-term contract[ual]" obligations, and moving all sportscasters to at-will employment. (Doc. # 91-15 at 2); (Doc. # 92-2 at 18) (noting that thirteen employees quit because they "knew what was pending"); (Doc. # 99 at 4); (Doc. # 99-15 at 2). Yet, revenue concerns notwithstanding, Mr. Miller continued scouting new talent and promised Mr. Romero a raise. (Doc. # 92-1 at 8); *see* (Doc. # 91-3 at 20).[4]

---

[3] A carriage contract refers to the amount a cable provider agrees to pay a network to "distribute" the network's television channel. *See* (Doc. # 91-3 at 11.) Mr. Miller likened carriage contracts to a regional network's "lifeblood." (Doc. # 92-2 at 11.)

[4] Per Mr. Romero, Mr. Miller also promised him a "guarantee[d]" $5,000 bonus payable by the end of 2019. (Doc. # 92-1 at 8.) Defendants' Reply does not make clear whether they dispute that Mr. Miller made such a promise. *Compare* (Doc. # 99 at 8) (reciting the promised bonus), *with* (Doc. # 109 at 6 (saying nothing about whether Mr. Miller promised a bonus).

3.  <u>Mr. Romero Clashes with Altitude's New Sportscasters</u>

Between fall 2018 and spring 2019, Mr. Miller successfully recruited three up-and-coming sportscasters—Katy Winge, Chris Dempsey, and Lauren Jbara. (Doc. # 91 at 4–5); (Doc. # 101-5 at 1).[5] The network chose to give each new sportscaster a contract; meanwhile, Mr. Romero remained at-will. (Doc. # 91-3 at 18); (Doc. # 100-2 at 6–7) (listing contracts issued to all three); *cf.* (Doc. # 92-2 at 42–43).

In fall 2018, Altitude began weaving Ms. Winge and Mr. Dempsey into the schedule. (Doc. # 99-8); *see* (Doc. # 91-3 at 4–5).[6] At first, the newcomers had lower-profile assignments. For example, Ms. Winge and Mr. Dempsey's duties for the Nuggets' 2018–2019 season consisted of sideline reporting, post-game segments, or radio coverage while either Mr. Lombardi or Mr. Romero hosted from Altitude's studio. (Doc. # 99-8 at 1–3.) Over time, Mr. Miller began assigning the newcomers more high-profile[7] assignments, which made Mr. Romero grow outspokenly critical. (Doc. # 92-2 at 38); (Doc. # 91-7 at 2); (Doc. # 92-1 at 22–23).

Mr. Romero's remarks landed him in a meeting with Mr. Miller on April 1, 2019. (Doc. # 92-2 at 46); *see* (Doc. # 91-6 at 6). At that meeting, Mr. Miller attempted to

---

[5] Given the nature of this lawsuit, it is worth noting that Ms. Winge is a white woman younger than forty; Mr. Dempsey is black and over forty, and Ms. Jbarra is Lebanese and younger than forty. *E.g.*, (Doc. # 91 at 4–5 nn.3 & 6.) Mr. Lombardi is white and only five years younger than Mr. Romero. (Doc. # 100-7 at 1.)

[6] Ms. Jbarra did not cover any Nuggets games in the 2018–2019 NBA season. *See* (Doc. # 99-8.)

[7] *See generally* (Doc. # 66 at ¶ 69) ("Working Nuggets games is the most high-profile assignment for on-air talent.")

discourage Mr. Romero from publicly disparaging his colleagues. *See* (Doc. # 91-3 at 47); (Doc. # 92-2 at 46); *cf.* (Doc. # 91-2 at 22). Mr. Miller also tried to emphasize that he viewed Mr. Romero as Altitude's best feature writer and asked that Mr. Romero utilize his versatility for the benefit of the network. (Doc. # 91-3 at 47); (Doc. # 102-1 at 10). Mr. Romero reportedly received this direction well and agreed to embrace the role that Mr. Miller envisioned for him. (Doc. # 92-2 at 46); *see also* (Doc. # 91-6 at 6).

4. <u>Mr. Romero Files His First EEOC Charge</u>

In August 2019, the carriage contract negotiations failed, and Altitude lost all three contracts. Two months later, however, the network managed to strike a new deal with DirecTV. *E.g.*, (Doc. # 91-3 at 12, 14.)

During this timeframe, Mr. Romero felt aggrieved as the result of three separate matters. The first incident occurred in September 2019—before the network regained its DirecTV contract. At the time, Altitude was in the process of creating two new shows, which Mr. Romero was assigned to co-produce and host, dedicated to the Colorado Avalanche NHL team and the Denver Nuggets—the "24/7 shows." However, citing the carriage dispute, Altitude notified Mr. Romero on September 23, 2019, that it decided to table both shows. (Doc. # 92-2 at 16) ("[I]t was not prudent to launch and promote a show that nobody could see. So that went away."); *see* (Doc. # 99-6); *see also* (Doc. # 100-3 at 2). Mr. Romero's second issue materialized in October 2019—also before the renegotiated contract with DirecTV—because he had still not been paid the $5,000 bonus that Mr. Miller allegedly promised him. (Doc. # 102-1 at 6.) Mr. Romero's third grievance concerned Altitude's on-air talent schedule for the 2019–2020 NBA season.

Namely, Mr. Romero took issue with how few Nuggets coverage opportunities he had compared to seasons past. (Doc. # 99 at 9) (citing Doc. # 102-2 at 3) (reporting between eleven and seventeen games that season compared to an average of fifty or sixty games in prior seasons); *see also* (Doc. # 99-4 at 4–5). He viewed these three issues as indications that he had fallen out of favor with the network.

On November 4, 2019, Mr. Romero submitted a formal complaint to Altitude's network president. (Doc. # 99-15 at 4.) On November 19, 2019, Mr. Romero filed an EEOC charge of discrimination. (Doc. # 99-15.) The 2019 charge accused Altitude of (1) underpaying him, (2) disfavoring him by declining to extend his contract or offer him a new one, (3) ignoring his complaints about his altercations with Ms. Winge, and (4) removing him from "high-profile assignments" that went instead to Ms. Winge. (Doc. # 66-1 at 3); (Doc. # 99-15 at 3–4).

Around this time, however, Mr. Romero was not the only Altitude employee filing complaints. For one, Mr. Romero reportedly struggled to maintain professional boundaries with female colleagues.[8] Further, Mr. Romero's colleagues began reporting to Altitude's human resources department that Mr. Romero was misbehaving in Altitude's recording studio. *E.g.*, (Doc. # 91-17 at 2.) Multiple employees described Mr.

---

[8] Five female Altitude employees confided in Ms. Winge that they had been subjected to Mr. Romero's uninvited and unnecessary commentary about their appearances. (Doc. # 91-4 at 18–20.) But Mr. Romero's misbehavior involved more than unsolicited comments. One colleague claimed that Mr. Romero changed clothes in front of her without any warning while covering a high school football game together. *Id.* at 20. Other female Altitude employees described Mr. Romero as having a propensity for behavior that was argumentative, patronizingly misogynistic, or downright "creepy." *Id.* at 20–21; *see also* (Doc. # 92-2 at 49) (recounting Mr. Romero's two attempts at thinly veiled sexual advances towards the same colleague).

Romero as disruptive, badmouthing other Altitude sportscasters, and creating an uncomfortably tense work environment. (Doc. # 92-2 at 37.) As a result, human resources called a meeting with Mr. Romero on or around January 22, 2020.[9]

5. Altitude Weathers the COVID-19 Pandemic

In March 2020, professional sports leagues suspended their 2019–2020 seasons. (Doc. # 92-2 at 15); *see, e.g.*, Associated Press, *NBA Says Virus Hiatus Will Likely Last "at least" a Month*, FOX News (Mar. 13, 2020), www.foxnews.com/sports/nba-says-virus-hiatus-will-likely-last-at-least-a-month.amp. These suspensions meant that sportscasters simply had nothing to cover. (Doc. # 92-2 at 15); *see, e.g.*, (Doc. # 91-14 at 2). To mitigate the lost revenue, Altitude began exploring other ways to engage with consumers. *E.g.*, (Doc. # 91-4 at 12); *see also* (Doc. # 91-13) (stating a plan to "[e]nhance and grow" Altitude's social media presence the month after the network lost all three carriage contracts). Consequently, on March 30, 2020, Altitude debuted "Sports Social"—a Zoom-based talk show that would "deliver live programming to Colorado-area sports fans." (Doc. # 99-16 at 1, 4); *see also* (Doc. # 100-5 at 3).

Sports Social further strained Mr. Romero's relationship with Altitude. He complained of feeling "excluded" and viewed the exclusionary acts as indicia that the network was retaliating against him for filing the 2019 EEOC charge. *See* (Doc. # 102-1 at 18); (Doc. # 102-2 at 1); (Doc. # 66-2 at 3–4). Yet Altitude did not entirely exclude Mr. Romero; he

---

[9] The record does not clarify the consequences of Mr. Romero's meeting—specifically, the contested issue of whether Altitude stripped him of his permission to use the studio. (Doc. # 91-17 at 2); (Doc. # 99-11 at 1) (Mr. Romero stating he was "not allowed" in the studio); *but see* (Doc. # 91-18 at 2) (Mr. Romero stating that he was in the studio in October 2020); (Doc. # 102-1 at 5) (same).

participated in Sports Social, albeit not via a central role. (Doc. # 102-2 at 1); *e.g.*, (Doc. # 99 at 9). On July 30, 2020, Altitude gave Mr. Romero the opportunity to host a full episode of a similar Zoom-based show specific to his beloved Nuggets—Nuggets Sports Social. *See generally* (Doc. # 102-2 at 1) (explaining the distinction). His ongoing battle with substance abuse, however, forced him to fumble the ball. When Mr. Romero attempted to record the Nuggets Sports Social episode, his consumption of Xanax, alcohol, and other illicit substances the night before left him looking too disheveled and impaired for Altitude to air the episode. *E.g.*, (Doc. # 92-1 at 26–27.) Shortly after this incident, Mr. Romero admitted himself into a detox facility. (Doc. # 92-11.) Following his release, Mr. Romero entered an inpatient facility for twenty-one days before returning to work. *E.g.*, (Doc. # 91-2 at 31.)

6. Mr. Romero Files his Second EEOC Charge

On September 25, 2020, Mr. Romero filed a second EEOC charge alleging that Altitude continued to discriminate against him and retaliated against him for filing the 2019 EEOC charge. Specifically, the 2020 charge recited Altitude (1) reneging on its promise to award Mr. Romero a $5,000 bonus; (2) expressly discouraging him from discussing his EEOC claims at work; (3) making "efforts to diminish [his] professional reputation"; (4) excluding him from hosting the "Sports Social" program; and (5) excluding him from the meeting referenced in the "All Nuggets Talent" group chat. (Doc. # 66-2 at 3.)

After filing his second EEOC charge, Mr. Romero took subsequent Altitude decisions as further signs of retaliation. He viewed his shrinking Nuggets coverage

responsibilities as Altitude effectively demoting him. *Id.*; (Doc. # 92-2 at 55–56); *cf.* (Doc. # 102-2 at 3); (Doc. # 99-9).[10] He also saw retaliatory intent behind Altitude's decision to exclude him from the NBA Draft Show in November 2020. (Doc. # 99-17.)

## B. PROCEDURAL HISTORY

On March 26, 2021, Mr. Romero filed this lawsuit. (Doc. # 1); *see also* (Doc. # 66) (the operative complaint). His Amended Complaint brought claims of discrimination and retaliation under the Americans with Disabilities Act ("ADA") (Counts I and II), Title VII (Counts III and IV), 42 U.S.C. § 1981 (Counts V and VI), and the Age Discrimination in Employment Act ("ADEA") (Counts VII and VIII). (Doc. # 66 at ¶¶ 122–183.) Mr. Romero also claimed breach of contract over the unpaid $5,000 bonus (Count IX). *Id.* at ¶¶ 184–88. Once discovery closed, Defendants filed the instant Motion for Summary Judgment challenging all nine claims. (Doc. # 91.)

## II. <u>STANDARD OF REVIEW</u>

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is essential to the proper disposition of the claim under the relevant substantive law. *Wright v. Abbot Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v.*

---

[10] The record is unclear as to how many Nuggets games Mr. Romero covered that season. For example, the second EEOC charge asserted eleven games while Mr. Romero counted seventeen games in his deposition. *Compare* (Doc. # 66-2 at 3), *with* (Doc. # 102-2 at 3). In any case, the number was still a marked decrease relative to prior seasons.

*Muskogee, Okla.*, 118 F.3d 837, 839 (10th Cir. 1997). When reviewing motions for summary judgment, a court may not resolve issues of credibility, and must view the evidence in the light most favorable to the nonmoving party—including all reasonable inferences from that evidence. *Id*. However, conclusory statements based merely on conjecture, speculation, or subjective belief do not constitute competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

The moving party bears the initial burden of demonstrating an absence of a genuine dispute of material fact and entitlement to judgment as a matter of law. *Id*. In attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claims; rather, the movant must point the court to a lack of evidence for the other party on any essential element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 644, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant meets its initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 256 (1986). The nonmoving party may not simply rest upon its pleadings to satisfy this burden. *Id*. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence from which a rational trier of fact could find for the nonmoving party." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id*. Ultimately, the Court's inquiry on summary judgment is whether the facts and evidence identified by the parties present "a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## III. <u>PARTY ARGUMENTS</u>

In short, Altitude contends that it is entitled to summary judgment on Mr. Romero's nine claims in their entirety for three reasons. First, Mr. Romero failed to administratively exhaust his discrimination and retaliation claims insofar as they relate to his 2016 contract's non-renewal and Mr. Miller promising him a $5,000 bonus. (Doc. # 91 at 11–12.) Second, Mr. Romero has not carried his burden of showing *prima facie* discrimination because he (a) cannot show adverse employment action nor (b) that his engagement in any protected activities caused those actions. *Id.* at 13–20. Even if he could show *prima facia* discrimination, Altitude continues, Mr. Romero has not rebutted the legitimacy of Altitude's proffered reasons for the actions it took. *Id.* Third, Mr. Romero's breach of contract claim fails for lack of consideration. *Id.* at 20. Separate from its arguments for summary judgment, Altitude also insists that self-serving and speculative deposition testimony fails to create a dispute of material fact.

Mr. Romero submits three counterarguments. First, he contends that disputes of material fact preclude summary judgment with regard to Altitude's motivations. (Doc. # 99 at 19–20.) Second, he identifies evidence in support of his *prima facie* showing of discrimination and retaliation. *Id.* at 12–13, 16–20. Third, he argues that his continued employment constitutes the consideration necessary to form an enforceable contract. *Id.* at 20.

# IV. <u>ANALYSIS</u>

## A.    ADMINISTRATIVE EXHAUSTION

Bringing a discrimination or retaliation claim under Title VII, the ADA, or the ADEA requires that the putative plaintiff first exhaust administrative remedies—namely, that he file a timely charge with the EEOC detailing each discrete act of discrimination or retaliation. *Fort Bend Cnty., Tex. v. Davis*, 139 S. Ct. 1843, 1851–52 (2019); *accord* 42 U.S.C. § 2000e-5(e)(1) (Title VII exhaustion requirement); 29 U.S.C. § 626(c) (same, ADEA); 42 U.S.C. § 12117(a) (same, ADA). Generally, an EEOC charge must be filed within 180 days of an allegedly unlawful employment practice's occurrence; if the claimant also instituted proceedings with an EEOC analog at the state or local government level, that timeliness deadline expands to 300 days. 42 U.S.C. § 2000e-5(e)(1); *see, e.g.*, *Hulsey v. Kmart, Inc.*, 43 F.3d 555, 557 (10th Cir. 1994) (explaining that an "occurrence" refers to the date on which the employer announces the adverse employment decision).

The exhaustion requirement is subject to equitable tolling. *E.g.*, *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1183 (10th Cir. 2018). Equitably tolling the statutory timeliness requirements under Title VII, the ADA, or the ADEA requires circumstances rising to the level of "active deception." *Edmons-Radford v. SW Airlines Co.*, 17 F.4th 975, 988 (10th Cir. 2021). "This is a high bar to overcome." *Id.* To show active deception, a plaintiff must show the employer's deliberate intent to deceive through actions that the employer should certainly know would cause the employee to delay filing an EEOC charge.

*Martinez v. Million Air Mechanical Inc.*, 2022 WL 843889, at *2 (D. Colo. Mar. 22, 2022) (unreported) (quoting *Hulsey v. Kmart, Inc.*, 43 F.3d 555, 557 (10th Cir. 1994)).

1. The 2016 Contract's Expiration

Turning to the instant case, Mr. Romero does not contest the untimeliness of his first EEOC charge with respect to the 2016 contract. He concedes that Mr. Miller announced Altitude's decision on February 13, 2018, and he filed his EEOC charge reciting this allegation on November 14, 2019. (Doc. # 66 at ¶ 41); (Doc. # 99-15 at 1); *see* (Doc. # 99 at 15–16). Nevertheless, Mr. Romero argues that equitable tolling should excuse his untimeliness because the delay was Altitude's fault for two reasons. First, according to him, Altitude's change of plans was pretext meant to deceive him. (Doc. # 99 at 15–16.) For support, he emphasizes that Mr. Miller advised him to not worry about losing his contract because same would soon happen to Mr. Romero's colleagues. *Id.* (accusing Mr. Miller of deception because he encouraged Mr. Romero "not to take his denied contract extension as 'bad news'"). Second, Mr. Romero stresses that he did not realize Altitude's pretext sooner because only later did he learn that other sportscasters received contracts or extensions after his contract expired. (Doc. # 99 at 10.)

The Court finds that equitable tolling does not apply here. Mr. Romero urges the Court find pretext in the fact that other sportscasters received contracts, but Mr. Romero himself endorsed offering contracts to the new sportscasters as a retention tool—the reasoning that Altitude cites. (Doc. # 92-1 at 17.) He also characterizes Mr. Miller's statements as deceptive, but—in Mr. Romero's own words—Mr. Miller merely told him

"his opinion that it was actually better for [him] to be at will than under contract." (Doc. # 102-1 at 3.) Nothing about that statement suggests a sinister ulterior motive. Moreover, Mr. Romero's argument begs the question that, but for this statement, he would not have known that Altitude misrepresented the reason for putting him on at-will status. Yet the record shows that Mr. Romero possessed enough information in February 2018 to reasonably suspect pretext because Altitude provided inconsistent reasons for refusing to extend his contract. *E.g.*, (Doc. # 66 at ¶¶ 30, 34, 41–42.)

In sum, these circumstances do not rise to the level of injustice necessary to warrant equitable tolling. The Court cannot ignore "[p]rocedural requirements established by Congress . . . out of a vague sympathy for particular litigants." *Baldwin Cnty. Welcome Ctr. v. Brown*, 466 U.S. 147, 152 (1984). Only an evidentiary showing that a plaintiff "has in some extraordinary way been prevented from asserting his or her rights" warrants equitable tolling. *Biester v. Midwest Health Servs., Inc.*, 77 F.3d 1264, 1267 (10th Cir. 1996). The record lacks evidence of such extraordinary interference. Consequently, the Court finds that Plaintiff failed to exhaust his administrative remedies with respect to the 2016 contract's expiration and, as such, grants summary judgment on that issue. To be clear, although the claims overall remain, Plaintiff is precluded from relying on the 2016 contract's expiration to prove his claims of discrimination and retaliation.

2.  <u>The $5,000 Bonus</u>

Altitude argues that Mr. Romero failed to administratively exhaust another discrete employment action—the nonpayment of the $5,000 bonus—because Mr. Romero omitted any mention of said bonus in either EEOC charge. (Doc. # 91 at 12.)

As mentioned above, administrative exhaustion must be both timely and specific—reciting each allegedly discriminatory or retaliatory employment action. *Martinez v. Potter*, 347 F.3d 1208, 1210 (10th Cir. 2003) (citation omitted). Unless a putative plaintiff files discrimination charges with "a state agency empowered to investigate employment discrimination claims"—the deadline to file a charge with the EEOC is 180 days. *E.g.*, *Rodriguez v. Wet Ink, LLC*, 603 F.3d 810, 812 (10th Cir. 2010); *accord* 42 U.S.C. § 2000e-5(e)(1). In Colorado, the relevant EEOC analogue is the Colorado Civil Rights Division ("CCRD"). The EEOC and CCRD have a "worksharing agreement" whereby each agency automatically files any discrimination charge it receives with the other agency. *Benton v. Town of S. Fork*, No. 12-cv-00336–CMA–KMT, 2013 WL 1324399, at *9, *12 (D. Colo. Feb. 12, 2013) (unreported) (explaining the worksharing agreement).

The parties agree that Mr. Romero did not receive a $5,000 bonus by the end of December 2019, and they further agree that Mr. Romero filed his second charge on September 25, 2020—269 days later. (Doc. # 66-2 at 1.) Further, the Court observes that Mr. Romero's second EEOC charge explicitly recites the promised $5,000 bonus, yet Altitude offers neither counterargument nor explanation for its puzzling reading of the EEOC charges. (Doc. # 66-2 at 3); *see* (Doc. # 109 at 7–10). Mr. Romero timely

filed his second discrimination charge with the CCRD. Seeing no actual dispute here, the Court finds that Mr. Romero timely and fully exhausted his administrative remedies with respect to the alleged promise of a $5,000 bonus. Thus, the Court denies Altitude's Motion insofar as it seeks to bar Mr. Romero from supporting his discrimination and retaliation claims using Altitude's failure to pay him the $5,000 bonus.

**B.     MR. ROMERO'S DISCRIMINATION AND RETALIATION CLAIMS**

Proving discrimination and retaliation requires satisfying the *McDonnell Douglas* burden shifting framework, which turns on evidence showing that discriminatory animus motivated adverse employment decisions and that any legitimate, non-discriminatory reason offered in rebuttal is in fact pretextual. *E.g.*, *Belgasem v. Water Pik Techs., Inc.*, 457 F. Supp. 2d 1205, 1211 (10th Cir. 2006); *accord McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801–05 (1973). However, before considering the burden-shifting framework, the Court must address two threshold legal arguments.

1.   Threshold Evidentiary Issues

First, Altitude contests the validity of Mr. Romero's evidence. Altitude insists that Mr. Romero's deposition testimony cannot create a dispute of material fact when it is self-serving, speculative, and uncorroborated. (Doc. # 109 at 2.) However, the case law it cites in support of heightened scrutiny focuses on affidavits and declarations—not deposition testimony. *See* Fed. R. Civ. P. 56(c)(4); *see generally Thomas v. Int'l Bus. Machines*, 48 F.3d 478, 485 (10th Cir. 1995) (explaining Rule 56's explicitly heightened

admissibility requirement for affidavits).[11] Moreover, to the extent that Altitude's argument meant to object to the admissibility of Mr. Romero's deposition, Altitude failed to root its objection in any specific Federal Rule of Evidence. Altitude therefore provides no reason to discount the evidentiary value of Mr. Romero's deposition testimony. As such, the Court considers said objections waived for purposes of summary judgment.

Second, Altitude argues that Mr. Romero cannot make a *prima facie* showing without showing adverse employment action. However, this argument requires little discussion—the very case law Altitude cites defines adverse employment action to include "a significant change in employment status, such as . . . reassignment with significantly different responsibilities." *Burlington Indus. v. Ellerth*, 524 U.S. 742, 760 (1998). Here, the evidence shows that Altitude assigned Mr. Romero considerably less Nuggets hosting assignments over time. *E.g.*, (Doc. # 102-1 at 8); *compare* (Doc. # 99-8), *with* (Doc. # 99-9). According to those most familiar with the sportscasting industry, Nuggets hosting duties are high-profile assignments, meaning his shifted workload

---

[11] Altitude cites several cases from this district for support, but Altitude misreads the precedent as supportive of a proposition that they simply do not reach. *Cf. Latham v. High Mesa Commc'ns*, No. 17-CV-2118, 2019 WL 8267700, at *2 (D. Colo. Dec. 19, 2019) (unreported) (stating that depositions must present admissible evidence to present a dispute of material fact but erroneously citing Tenth Circuit precedent that discusses how **affidavits** cannot adequately dispute a material fact under Rule 56); *Jackson v. Stonebridge Hospitality Assocs.,* LLC, 2019 WL 5622645, at *9 (D. Colo. Oct. 31, 2019) (unreported) (specifying that conclusory **affidavits** cannot present a dispute of material fact). Moreover, it seems that the Tenth Circuit keeps citing *Thomas v. International Business Machines* for the quote that "the content or substance of the evidence must be admissible" without specifying that *Thomas* was specifically and **only** discussing affidavits. *Thomas*, 48 F.3d at 485 ("For example, hearsay testimony that would be inadmissible at trial may not be included **in an affidavit** to defeat summary judgment. . . . '[G]eneralized, unsubstantiated, non-personal **affidavits** are insufficient to successfully oppose a motion for summary judgment.'" (emphasis added)). The distinction makes sense given that depositions are less vulnerable to attorney gamesmanship than affidavits and declarations.

during and after the pandemic could qualify as significantly different responsibilities. (Doc. # 66 at ¶ 69; Doc. # 100-2 at 12); *cf. Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532 (10th Cir. 1998) (concluding otherwise where the change in responsibilities was much smaller).

2.  <u>Disputed Material Facts Preclude Summary Judgment</u>

On a motion for summary judgment, the material facts that animate the *McDonell Douglas* framework must be undisputed. Upon review of the parties' filings and the evidence referenced therein, the Court determines that genuine issues of material fact preclude the Court from entering summary judgment in Defendants' favor on Mr. Romero's discrimination and retaliation claims. Mr. Romero has presented sufficient evidence to show a triable issue as to whether discriminatory or retaliatory motives animated the following employment decisions:

- Altitude's reasons for indefinitely suspending the 24/7 shows,

- Altitude's reasons for denying Mr. Romero the opportunity to appear on Sports Social as a "main host,"

- Altitude's decision to shift Mr. Romero's workload from mostly hosting assignments to mostly feature writing and other miscellaneous duties, and

- Whether Altitude forbade Mr. Romero from using Altitude's recording studio, and

- Whether Altitude promised Mr. Romero a $5,000 bonus, the terms of that promise, and whether valid consideration supported that promise.

As such, Altitude has not carried its burden under Rule 56 with respect to Counts 1 through 8 of Mr. Romero's Amended Complaint (Doc. # 66).

## C.   MR. ROMERO'S BREACH-OF-CONTRACT CLAIM

Altitude also demands summary judgment dismissing Mr. Romero's claim for breach of contract over the unpaid $5,000 bonus. (Doc. # 91 at 20); Doc. # 109 at 10). To reiterate, Altitude argues that no contract formed due to lack of consideration and, for support, cites an unreported case from this district to imply that Mr. Romero gave nothing of value to Altitude. (Doc. # 91 at 20 (citing *Hudson v. Wagner's, LLC*, No. 21-CV-01884, 2022 WL 3597163 (D. Colo. Mar. 30, 2022)).)[12] Mr. Romero, for his part, contends that his continued employment during 2019 constituted the consideration necessary to form a contract. (Doc. # 99 at 20.) In its Reply, Altitude curtly dismisses the proposition that Mr. Romero's continued employment constitutes adequate consideration—notably, without citation to legal authority. (Doc. # 109 at 10.)

Federal courts considering the formation of a contract apply the law of the state in which the contract formed. *See, e.g.*, *Tucker v. R.A. Hanson Co.*, 956 F.2d 215, 217–18 (10th Cir. 1992). In Colorado, a contract's formation requires capacity to contract, mutual assent to an exchange of value and, at issue here, the exchange of legal consideration. *E.g.*, *FDIC v. Fisher*, 292 P.3d 934, 937 n.2 (Colo. 2013) (quotation

---

[12] The Court need not spend much time on *Hudson*, which stands for a much narrower proposition than Altitude suggests—that a promised bonus cannot constitute the "special consideration" necessary to rebut the presumption of at-will employment status in a suit for breach of contract over premature termination. *Hudson*, 2022 WL 3597163, at *4, *6 (citing *Snoey v. Ad. Forming Tech., Inc.*, 844 F. Supp. 1394 (D. Colo. 1994) (discussing special consideration to enforce a promise allegedly altering his employment status)).

omitted). Adequate consideration constitutes "any benefit to a promisor or any detriment to a promisee." *Lucht's Concrete Pumping, Inc. v. Horner*, 255 P.3d 1058, 1061 (Colo. 2011) (en banc) (citations omitted) (discouraging courts from assessing the adequacy of consideration absent "extreme circumstances"). Further, the continuation of work constitutes cognizable consideration under Colorado law unless the employee's continued employment fulfills preexisting contractual obligations. *E.g.*, *Kuta v. Joint Dist. No. 50(J) of Cntys. Of Delta, Gunnison, Mesa, & Montrose*, 799 P.2d 379, 382 (Colo. 1990) (en banc).

As a legal matter, Colorado law recognizes the continuation of work as cognizable consideration unless the employee promised to do that work anyway. *Horner*, 255 P.3d at 1062; *see Troutman v. Webster*, 257 P. 262, 263–64 (1927) ("[I]t is a consideration if the promisee, in return for a promise . . . refrains from doing anything which he has a right to do, even [if] there is no . . . actual benefit to the promisor."). The Court believes that it is for a jury to assess whether Mr. Romero's continued employment constitutes adequate consideration. *Horner*, 255 P.3d at 1061. Consequently, the Court denies Altitude's Motion for Summary Judgment as it relates to Mr. Romero's breach-of-contract claim, Count 9.

## IV. <u>CONCLUSION</u>

Based on the foregoing, the Court ORDERS as follows:

- Defendants' Motion for Summary Judgment (Doc. # 91) is GRANTED IN PART AND DENIED IN PART.

    ○   It is GRANTED with respect to Plaintiff's failure to exhaust administrative remedies for a discrimination or retaliation claim based on Altitude's refusal to renew his 2016 employment contract.

    ○   It is DENIED in all other respects.

DATED: January 8, 2023

BY THE COURT:

CHRISTINE M. ARGUELLO
Senior United States District Judge